**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **MICAELA GIUHAT,** *Plaintiff*, | § | |
| **v.** | § | **CIVIL ACTION NO. ________** |
| **GENBAND HOLDINGS CO., GENBAND MGMT SERVICES CORP., GENBAND US, LLC (f/k/a GENBAND INC.).** *Defendants.* | § | |

**PLAINTIFF'S ORIGINAL COMPLAINT AND JURY DEMAND**

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW Plaintiff Micaela Giuhat ("Giuhat" or "Plaintiff") and files this, her Original Complaint and Jury Demand against Defendants Genband Holdings Co., Genband Management Services Corporation, and Genband US, LLC (f/k/a/ Genband Inc.) ("GENBAND" or "Defendants"), concerning discrimination and retaliation arising under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, and the Texas Commission on Human Rights Act, TEX. LAB. CODE § 21.001, *et seq*. In support thereof Plaintiff respectfully states as follows:

## I. JURISDICTION AND VENUE

1. This Court has jurisdiction to hear the merits of Plaintiff's claims under 28 U.S.C. §§ 1331 and 1343(a)(4), and 42 U.S.C. § 2000e-5(f)(3). The Court has supplemental jurisdiction over Plaintiff's claims under the Texas Labor Code and Texas Law because those claims are so related to the claims in the action with the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. 28

U.S.C. § 1367.

2. Venue is proper in this district under 28 U.S.C. § 1391 and 42 U.S.C. § 2000e-5.

## II. PARTIES

3. Plaintiff is a female United States citizen, born in Romania, and is a resident of Plano, Texas.

4. Defendant Genband US, LLC is a foreign limited liability company registered and doing business in the state of Texas and can be served with process through its registered agent for service, Corporation Service Company d/b/a CSC-Lawyers Incorporating Service Company, 211 E. 7th Street, Suite 620, Austin, TX 78701-3218.

5. Defendant Genband Management Services Corp., is a Delaware corporation and affiliate of Genband LLC, doing business in the state of Texas at 2801 Network Blvd. #300, Frisco, TX 75034. Defendant can be served with process through its President and CEO David Walsh, at 2801 Network Blvd. #300, Frisco, TX 75034.

6. Defendant Genband Holdings Company is the parent company of Genband Management Services Corp., and a Cayman Islands exempted company limited by shares. Defendant can be served with process through its President and CEO, David Walsh, at 2801 Network Blvd. #300, Frisco, TX 75034.

## III. FACTUAL BACKGROUND

8. Defendants Genband et al., is a global leader of IP infrastructure and application solutions, enabling fixed, mobile and cable service providers around the world to evolve their networks. GENBAND offers market-leading Switching, Applications, Networking and Service solutions, with products deployed in over 600 customer networks spanning more than 80 countries. Genband has operations in 50 countries and is based in Frisco, Texas, with its

headquarters located at 2801 Network Boulevard, Suite 300, Frisco, TX 75034. Genband has over 600 local employees, 2200 in the U.S., and approximately 3000 worldwide.

9. Genband et al., is an "employer" within the meaning of Title VII of the Civil Rights Act of 1964 as amended, 49 U.S.C. § 2000e(b) and TEX. LAB. CODE § 21.002(8).

10. Micaela Giuhat is a female United States citizen, born in Romania, and is a resident of Plano, Texas. Ms. Giuhat has a "foreign" accent.

11. GENBAND hired Ms. Giuhat on April 20, 2008 as Vice President of Product Management**.** During Ms. Giuhat's tenure with the Defendant GENBAND rated Giuhat as "Exceeds Expectations" performance evaluation every year – for 2008 through the end of 2012 – before terminating her on April 11, 2013.

12. In February of 2010, GENBAND recognized Ms. Giuhat's excellent work by inviting her to the "President's Club." The President's Club is an "invitation only," paid trip awarded to outstanding GENBAND performers. A "President's Club" invitation is one of the highest honors GENBAND can award to a non-salesperson.

13. Despite Giuhat's outstanding performance, GENBAND discounted the value of her diligent work by passing her over for promotion and paying her less money than her male counterparts.

14. In 2010, GENBAND acquired part of the telecommunications company Nortel. After the acquisition GENBAND ousted Ms. Giuhat from her position of Vice President – Product Management in favor of a male employee. Notwithstanding being honored with a "President's Club" invitation only months earlier, in July of 2010 GENBAND moved Giuhat to the position of Vice President - Product Marketing. Before the Nortel acquisition Giuhat

requested to stay in her Product Management position, but was moved in to Marketing without an explanation.

15. In addition to sex discrimination against herself, Ms. Giuhat witnessed the GENBAND Management Team oust female executives in an effort to create an "all-male" executive team.

16. Near the end of 2011, Giuhat witnessed GENBAND replace the only two female executives of GENBAND -- Jan Goulding (CFO) with Daryl Raiford (male) and Shauna Martin (Executive Vice President and Chief Legal Officer) with Zachary Green (male).

17. In about March of 2012, GENBAND assigned Ms. Giuhat to work for Mark Pugerude. Giuhat realized soon thereafter that GENBAND and Pugerude were trying to bully and harass her into quitting.

18. Mr. Pugerude repeatedly degraded Giuhat via email and during staff calls. Mr. Pugerude treated Giuhat and other female employees so poorly that Giuhat complained to GENBAND'S Chief Human Resources Officer (Sean Huurman) in the summer of 2012.

19. On September 26, 2012, after complaining to HR, and being in a different group, Mr. Pugerude sent Giuhat a particularly dismissive and abusive email, which she received. Mr. Pugerude sent Giuhat this dismissive and abusive email after Giuhat questioned the acquisition of a company named Ventraq. Questioning aspects of this acquisition was part of Giuhat's job duties, but as a team player, she said that she was "happy to do whatever we need to."

20. Despite Giuhat's willingness to do whatever GENBAND thought was best, Mr. Pugerude's email to her stated, "What the hell is wrong with you???? I have been working this deal for 2 years and means even more to me now that I am running sales. Don't kill deals!!!!!!!! You need deal flow."

21. Mr. Pugerude furthered GENBAND's hostile treatment of female employees and hostile environment for female employees by harassing a female employee named Beth Strickland, who at the time was Vice President of Sales for a strategic account. Mr. Pugerude treated Ms. Strickland so harshly that she was driven to tears on multiple occasions. GENBAND eventually fired Strickland from her position.

22. GENBAND eventually seemed to recognize Ms. Giuhat's diligent and excellent work in July of 2012 by moving her to the position of Vice President of Corporate Development, reporting directly to CEO Charlie Vogt. However, GENBAND discriminatorily failed to reward Giuhat with a bonus or a raise despite the change in position and responsibility. Then, in furtherance of its sexist agenda, GENBAND's all-male Executive Management Team decided days later that Giuhat should not report directly to the CEO, but instead to CFO Daryl Raiford. Giuhat asked GENBAND CEO Vogt why she was being made to report to Daryl Raiford. Vogt replied evasively and with an answer that made reference to the glass ceiling. Vogt replied, "It was not the right time." Meanwhile, it was the right time to promote male executives at GENBAND. A couple of months later, GENBAND promoted Sam Waicberg to CMO, Chief Marketing Officer, to report directly to the CEO. This was part of GENBAND's pattern and practice of having a double standard, favoring male employees over female employees and United States born employees over foreign born employees.

23. Despite undertaking responsibilities that were thought of as important enough to report directly to the CEO, GENBAND failed to promote Giuhat to the position of Senior Vice President. During the same time period, GENBAND promoted John McCready and Shailin Sehgal (both males) to the position of Senior Vice President while failing to promote Ms. Giuhat and failing to consider her for a promotion.

24. After one of Ms. Giuhat's staff resigned in November 2012, GENBAND would not allow her to replace him, despite the high workload for Giuhat's group that had experienced an increase in job responsibilities with no or very little support from the CFO, to whom Giuhat reported. Giuhat made numerous attempts to talk to Daryl Raiford, to discuss issues and projects, but Raiford would not engage in these discussions, as witnessed by Raiford's assistant. Ms. Giuhat had more responsibilities than similarly situated male employees of GENBAND, with less staff, and no support. Meanwhile, GENBAND permitted male, U.S. born executives to have sufficient support. This was part of GENBAND's pattern and practice of having a double standard, favoring male employees over female employees and United States born employees over foreign-born employees.

25. In addition to discriminatorily failing to promote Giuhat due to her gender and her non United States born status, GENBAND paid more compensation to several male Directors who were below Ms. Giuhat's level, including Kevin Summers and Arjun Cholkar. GENBAND also paid lower compensation to Ms. Giuhat's Vice President counterparts due to gender.

26. Throughout Ms. Giuhat's employment at GENBAND, GENBAND management officials harassed her and made fun of her because of her "foreign" accent. Ms. Giuhat tried to put this out of her mind, but this abusive treatment hurt her feelings, made her uncomfortable, and reminded her that she was not part of the United States born men's club that ran GENBAND who were the favored employees at GENBAND.

27. In addition to the hostile environment propagated by Mr. Pugerude, Zach Green also subjected Ms. Giuhat to similar treatment. Mr. Green called Giuhat into his office on April 3, 2013, and complained about not being sufficiently involved in the "GENWare" deal.

28. An outside banker, John Emery, witnessed Mr. Green's inexperience in deal negotiations and poor decision-making. GENBAND brought in Emery to provide advice on the sale of GENBAND's software "GENWare." Mr. Green made uncommon demands to be in the middle of the business aspects of the deal not pertaining to him, but pertaining to the business owners who were deeply involved in the deal, and stalled the process on purpose to undermine Giuhat's work.

29. Mr. Green's poor performance was also exemplified in the negotiations for an acquisition deal with a company called Ventraq. Mr. Green's abrasive tactics almost spoiled the deal with Ventraq, where Ventraq's owner called Green a "bully," in front of Daryl Raiford on April 10, 2013.

30. Sam Waicberg furthered GENBAND's hostile treatment of female employees and hostile environment for female employees by harassing and mistreating a female employee named Sara Hughes. Ms. Hughes reported to Ms. Giuhat in her position as Director of Product Marketing. Waicberg asked Giuhat to give him reasons why he could terminate Ms. Hughes. Waicberg was looking for a pretext. Giuhat told Waicberg that Ms. Hughes was a terrific employee. Waicberg treated Ms. Hughes so poorly that Ms. Hughes was forced to leave the department and take a different position within the sales department. Hughes was an excellent employee and who had been named GENBAND's employee of the year in 2011 before Waicberg began his efforts to fire her.

31. Mr. Waicberg highly exaggerated his relationships with Samsung (the company) to secure and advance his position as Chief Marketing Officer within GENBAND. In March 2013, after it became clear that Mr. Waicberg's Samsung friend was not enough to define the relationship between the two companies, Ms. Giuhat was asked to reach out to one of her own

Samsung contacts, which she did, fully informing and discussing the meeting with Mr. Waicberg, Daryl Raiford (CFO) and Mr. Vogt. After the meeting, which resulted in a very positive relationship between GENBAND R&D and Samsung, Ms. Giuhat was made privy to an email in which Mr. Waicberg was trying to undermine her position by falsely stating to Mr. Vogt that she had met with Samsung without Mr. Waicberg's knowledge or permission. Mr. Waicberg was not punished, reprimanded or demoted for this lie. Mr. Waicberg remained in his position as Chief Marketing Officer until he was replaced (by not terminated) by another U.S.A. born male employee.

32. In early 2013, CEO Vogt let his discriminatory bias slip in front of Ms. Giuhat, telling her that she was lucky that she worked and that her family had dual income. Vogt said this to Giuhat, a female employee, despite the fact that Vogt was in the same situation, given that his wife worked at GENBAND. The "lucky she worked and her family enjoying dual income" attitude of Vogt applied to Giuhat, a female, but not to Vogt, a male.

33. In February of 2013, after spending five years with the company, GENBAND gave Ms. Giuhat her first and only raise. GENBAND failed to provide Giuhat this raise until after she complained to Daryl Raiford and HR (Ashley McGimsey and Megan Pierce) in November, 2012, about not receiving a raise since starting with the company. In the conversation with HR, Giuhat also complained about pay discrimination at GENBAND against herself and other female employees due to our gender. In response, the HR admitted the truth of Giuhat's complaint by replying to Giuhat, "That's why I'm here."

34. During his stint as VP – Product Management, John McCready furthered GENBAND's hostile treatment of female and foreign origin employees and hostile environment for female and foreign origin employees, by mistreating Natasha Guytan (Russian-born origin)

so poorly she was forced to resign. Ms. Giuhat was Ms. Guytan's former manager. Ms. Guytan was an exceptional employee.

35. GENBAND furthered GENBAND's hostile treatment of female employees and hostile environment for female employees by blaming Ms. Giuhat for things outside of her control. A few weeks prior to Ms. Giuhat's termination, CEO Vogt told Giuhat that she received a "black eye" because the "tekVizion" acquisition, which closed on April 11, 2013, had taken longer than anticipated to close. The "tekVizion" deal was delayed due to external factors outside of Giuhat's power. GENBAND had a double standard, favoring male employees over female employees and United States born employees over foreign born employees. Zachary Green was also involved in the tekVision deal, was fully aware of why the deal took longer than anticipated, but Vogt did not tell him he had acquired a "black eye."

36. CEO Vogt discounted the value of female employees in the workplace. Vogt's expectation bred and fostered a culture of discrimination within GENBAND.

37. On April 9, 2013, CFO Daryl Raiford held his weekly staff meeting. At this meeting Mr. Raiford subjected Ms. Giuhat to a hostile work environment by yelling at her in front of the entire staff meeting about not providing him with proper and timely information pertaining to a current deal. The display by Raiford was very degrading and false as Mr. Raiford had not requested information by a certain date.

38. On April 10, 2013, Mr. Raiford's assistant sent Ms. Giuhat a text message stating that Mr. Raiford wanted to meet with her. Later on April 10, 2013, Raiford met with Giuhat and stated to her that she was being terminated.

39. The termination came without any prior warning and was a severe blow to Ms. Giuhat. Ms. Giuhat went into the termination meeting thinking that Mr. Raiford was going to apologize to her for his abusive conduct at the staff meeting the previous day.

40. At the termination meeting, Raiford said, "This is a tough decision, but we are letting you go. We looked for other openings within the company to transfer you, but nothing was open." Ms. Giuhat was then told her last day would be April 12, 2013. Giuhat told Raiford that she had a vacation day on the 12th. Raiford then said that her last day would be April 11, 2013. GENBAND also told Giuhat in the termination meeting that it was looking for someone with more M&A (mergers and acquisitions) experience.

41. Later that day, in order to wrap up her affairs with GENBAND, Giuhat provided CEO Vogt with information pertaining to an M&A deal on which she had been working. In response, Mr. Vogt sent Ms. Giuhat an email that said, "You are special. Thing [sic] will work out and our paths will cross again!" Vogt then praised Ms. Giuhat's dedication and work ethic in his email to the GENBAND Management team, stating, "Micaela gets told she is out today, though at 7:03[p.m.] she remains committed to the business. I am proud of the culture that has been fostered here at Genband."

42. In fact GENBAND and Vogt fostered a culture of a U.S.A. Men's only club. Despite being "special," Ms. Giuhat was not born in the United States of America and she was not an American man. Ms. Giuhat's excellent and hard work did not count because of her gender and birth origin. GENBAND's termination of Giuhat was because of these factors, plus Ms. Giuhat's complains of gender discrimination.

43. On information and belief, GENBAND replaced Ms. Giuhat with John McCready, a male former co-worker, born in the U.S.A. Although Mr. McCready, who assumed

Ms. Giuhat's job duties, had no proven experience in M&A, he was immediately promoted to Chief Strategy Officer, reporting directly to Vogt. GENBAND also provided McCready more staff, continuing a double standard that favored the male, U.S.A. born employee over the female, foreign born employee's such as Giuhat.

44. On April 11, 2013, GENBAND presented Ms. Giuhat with an 8 page document that labeled, "Amended Separation Agreement." The document stated that the company would pay Ms. Giuhat a certain amount of money if she agreed to release her rights to pursue a lawsuit against GENBAND for claims including gender and national origin discrimination in employment. Ms. Giuhat did not sign the document. Providing this separation agreement with a release of claims before she brought any claims against GENBAND is evidence of malice by GENBAND in connection with its termination of Giuhat.

45. GENBAND discriminated against Giuhat when it subjected her to a hostile working environment, refused to promote her, paid her less than her male counterparts, and terminated her employment because of her sex and national origin, Romanian, in violation of Title VII, 42 U.S.C. § 2000e-2(a) the Texas Commission on Human Rights Act, TEX. LABOR CODE § 21.001, *et seq.* In addition, GENBAND retaliated against Giuhat by terminating her employment because of her protected activity of complaining about discriminatory pay due to gender. GENBAND's retaliation is in violation of Title VII, 42 U.S.C. § 2000e-3(a) the Texas Commission on Human Rights Act, TEX. LABOR CODE § 21.055.

46. Ms. Giuhat timely filed a charge of discrimination for sex and national origin discrimination and retaliation on May 20, 2013 with the EEOC and Texas Commission on Human Rights Rights Division. More than 180 days have elapsed since Giuhat filed her

discrimination charge. Giuhat requested that the TWC issue her a "right to sue" letter on January 29, 2013. Giuhat has satisfied all jurisdictional prerequisites for filing this action.

## IV. CAUSES OF ACTION

**SEX DISCRIMINATION AND RETALIATION**

47. Plaintiff re-alleges and incorporates the allegations contained in Paragraphs 1 through 46 as if fully stated herein.

48. Plaintiff has satisfied all jurisdictional prerequisites in connection with her claims under Title VII and the TCHRA.

49. Defendants' actions, including but not limited to discrimination in compensation and the ultimate termination of Plaintiff, were undertaken because of Plaintiff's sex and her opposition to discriminatory practices. These actions constitute a willful, continuing violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq*. and the Texas Commission on Human Rights Act, TEX. LAB. CODE § 21.001, *et seq*.

50. Due to Defendants' actions, including but not limited to GENBAND's discriminatory pay practices and Plaintiff's ultimate termination, Plaintiff has suffered, and continues to suffer, damages including but not limited to lost wages, both past and future, the value of GENBAND stock and other fringe benefits, emotional pain, suffering, inconvenience, mental anguish, and loss of enjoyment of life.

51. Defendants' actions referenced in paragraphs 1 through 46 were intentional, malicious, and committed with reckless indifference to Plaintiff's federally and state protected rights under Title VII and the Texas Commission on Human Rights Act, TEX. LAB. CODE § 21.001, *et seq*., thus entitling Plaintiff to punitive damages.

52. Defendant's actions referenced above in paragraphs 1 through 46 have caused

Plaintiff to retain the services of the undersigned counsel in order to pursue her state rights in this action. Plaintiff seeks her reasonable attorneys' fees and costs in this matter.

53. Additionally, Plaintiff is entitled to receive her expert fees, and costs of court.

**NATIONAL ORIGIN DISCRIMINATION**

54. Plaintiff repeats and re-alleges the allegations contained in the above paragraphs as if fully stated herein.

55. Defendants' action in treating Plaintiff less favorably (including but not limited to discrimination in compensation) than non-Romanian born employees, and terminating Plaintiff's employment was because of her nation of origin, Romania, were in violation of Title VII, 42 U.S.C. § 2000e, *et seq*. and the Texas Commission on Human Rights Act, TEX. LAB. CODE § 21.001, *et seq*.

56. As a result of Defendants' unlawful actions described above, Plaintiff has incurred lost wages, both past and future, including the value of lost and/or replacement benefits.

57. As a result of Defendants' unlawful national origin discrimination, Plaintiff has suffered compensatory damages by reason of future pecuniary loss, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary damages.

58. At all times relevant to this action, Defendants acted with malice or reckless indifference to Plaintiff's federally and state protected rights under Title VII and the Texas Commission on Human Rights Act, TEX. LAB. CODE § 21.001, *et seq*., thus entitling Plaintiff to punitive damages.

59. Additionally, Plaintiff is entitled to receive her attorneys' fees, expert fees, and costs of court.

## V. JURY DEMAND

60. Plaintiff hereby demands a jury trial on all issues, claims, actions, and defenses against Defendant.

## VI. PRAYER

WHEREFORE, Plaintiff, respectfully requests that the above-named Defendants Genband Holdings Co., Genband Management Services Corporation, and Genband US, LLC (f/k/a/ Genband Inc.), be cited to appear in this matter and that, after a jury trial by proof, Plaintiff be awarded:

a. Judgment against Defendants ordering Defendants to take such other reasonable actions as may be necessary to remedy the effects of Defendants' violations of 42 U.S.C. § 2000(e), *et seq.* and the Texas Labor Code;

b. Judgment against Defendants for lost wages, compensation (including bonuses and stock options) and benefits, both back pay and benefits and front pay and benefits;

c. In the alternative to front pay and benefits, judgment against Defendants reinstating Plaintiff to her position of employment, equivalent position of employment, or the position of employment she would have enjoyed but for the discrimination, if reinstatement is deemed feasible;

d. Judgment against Defendants for compensatory damages including emotional pain, suffering, inconvenience, mental anguish, and loss of enjoyment of life;

e. Judgment against Defendants for punitive damages to the extent allowed under the law;

f. Pre-judgment interest at the appropriate legal rate on all amounts awarded;

g. Interest after judgment at the appropriate legal rate on all amounts awarded until paid in full;

h. Judgment against Defendants for Plaintiff's reasonable attorneys' and experts' fees;

i. Appropriate declaratory and injunctive relief;

j. Costs of suit; and

k. Such other and further relief to which Plaintiff may justly be entitled.

Dated: February 19, 2014

Respectfully submitted,

GILLESPIE SANFORD LLP
4925 Greenville Ave., Suite 200
Dallas, Texas 75206
Phone: (214) 800-5111
Fax: (214) 838-0001
E-mail: hkg@gillespiesanford.com

By: */s/ Hal K. Gillespie*
Hal K. Gillespie
Attorney-in-Charge
State Bar No. 07925500

And

Walt D. Roper
State Bar No. 00786208
The Roper Firm, PC
3001 Knox Street
Dallas, Texas 75205
State Bar No. 00786208
Phone: (214) 420-4520
Fax: (214) 856-8480
E-mail: walt@roperfirm.com